Marvin Berry v. Commissioner. Elizabeth Jane Berry v. Commissioner.
Berry v. Commissioner
Docket Nos. 12966, 13028, 15647, 12983, 13027, 15665.
United States Tax Court
1952 Tax Ct. Memo LEXIS 273; 11 T.C.M. (CCH) 301; T.C.M. (RIA) 52093; April 3, 1952
Geo. H. Zeutzius, Esq., and A. P. G. Steffes, Esq., 510 S. Spring St., Los Angeles, Calif., for the petitioners. Earl C. Crouter, Esq. *274 , for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined deficiencies in the petitioners' tax liabilities and asserted penalties as follows: Marvin Berry
Docket No.
Year
Tax
Deficiency
Penalty
12966
1941
Income
$ 7,156.35
13028
1941 [1]
Income
7,156.35
12966
1942
Income
19,070.05
$ 7,477.93
13028
1942 [1]
Income
19,070.05
7,477.93
12966
1943
Income and victory
90,171.00
49,851.80
13028
1943 [1]
Income and victory
90,171.00
49,851.80
15647
1944
Income
35,898.16
17,949.08
15647
1945
Income
69,911.08
34,955.54
Elizabeth Jane Berry
Docket No.
Year
Tax
Deficiency
Penalty
12983
1941
Income
(overassessment)
13027
1941 [1]
Income
(overassessment)
12983
1942
Income
$ 6,503.90
$ 1,680.30
13027
1942 [1]
Income
6,503.90
1,680.32
12983
1943
Income and victory
5,434.79
7,497.19
13027
1943 [1]
Income and victory
5,434.79
7,497.19
15665
1944
Income
(overassessment)
15665
1945
Income
756.40
378.20
The respondent amended his pleadings to request *275 additional deficiencies and penalties. The issues are: 1. Do we have jurisdiction in any of the proceedings with respect to the taxable years 1941, 1942, and 1943? 2. Did petitioner Marvin Berry omit 25 per cent of his gross income from his return for the year 1941? 3. Has the respondent correctly determined and allocated petitioners' community income? 4. Have petitioners shown the source of cash payments made from time to time and, if not, has respondent erred by including such amounts in petitioners' gross income? 5. Were the proceeds from shipments of tomatoes owned by Berry but sold in the names of Berry's mother and mother-in-law income to Berry? 6. Have petitioners shown the source of certain living expenses and, if not, did respondent err by including in gross income amounts estimated to represent such expenses? 7. Did respondent err in disallowing a deduction for the purchase price of cranberries where the sales price was not reported? 8. Were the amounts of certain checks written in 1944 and charged to expenses in that year but voided in 1946 allowable deductions in 1944? 9. Were the proceeds of certain sales properly reflected in a sales account? 10. *276 Has respondent correctly determined the cost basis of a house sold by Berry? 11. Were any of nine checks antedated as determined by respondent? 12. Did the respondent correctly disallow a deduction for an alleged duplication in purchase entries on Berry's books? 13. Did respondent err by including in petitioners' income the estimated proceeds of a carload of potatoes allegedly sold but unreported? 14. Was respondent correct in making additions to petitioners' income for the years 1942 and 1943 in the amounts of $24,840.01 and $27,625.81, respectively? 15. Was $30,000 paid by Berry in 1944 rent or part of the purchase price of certain farm land? 16. Were the deficiencies or any part thereof in the tax liabilities of petitioner Marvin Berry for the years 1942 to 1945, inclusive, or petitioner Elizabeth Jane Berry for the years 1942, 1943, and 1945, due to fraud? 17. Is either petitioner entitled to the "forgiveness" provisions of the Current Tax Payment Act of 1943 *? Findings of Fact All oral and written stipulations of the parties are hereby adopted and incorporated *277 herein by reference. The petitioners in these proceedings are Marvin Berry and Elizabeth Jane Berry, husband and wife, who reside in Bakersfield, California. Their tax returns for the period here involved were filed with the collector of internal revenue for the sixth district of California, at Los Angeles. Marvin Berry, hereinafter sometimes called petitioner, moved to California from the State of Washington in 1937. He married Elizabeth Jane Gumm on August 30, 1941. Berry engaged in the business of raising, buying and selling vegetables and other products. He dealt chiefly in potatoes and tomatoes. Bakersfield, in and around which he operated, is the center of a large agricultural producing area in Kern County, California, located about 115 miles north of Los Angeles. Prior to his marriage, Berry operated under the name of Two Boys Fruit & Produce. Subsequent to his marriage on August 30, 1941, Berry conducted the business under the name of Marvin Berry Company (hereinafter sometimes referred to as the Company). Jeopardy assessments were made against petitioners on July 18, 1946, covering taxes, interest and penalties for the taxable years 1942 and 1943. A jeopardy assessment *278 was also made on the same date against petitioner Marvin Berry for taxes and interest for the taxable year 1941. These assessments became invalid when the respondent failed to mail the requisite notices of deficiencies under section 272 of the Internal Revenue Code within the 60-day period as required by section 273 (b) of the Internal Revenue Code. On September 24, 1946, the respondent again made jeopardy assessments against the petitioners for the same years. Timely deficiency notices relative thereto were sent to petitioners on November 2, 1946. The notice mailed to petitioner Marvin Berry determined deficiencies and penalties for the taxable years 1942 and 1943 and a deficiency for 1941. The one sent petitioner Elizabeth Jane Berry determined deficiencies and penalties for the taxable years 1942 and 1943 and an overassessment for the year 1941. Petitions for the redetermination thereof were timely filed with the Court and docketed as numbers 12966 and 12983, respectively. There having been defects of a nature not explained in the record in the penalty assessments of September 24, 1946, the respondent made additional jeopardy assessments *279 against petitioners on November 12, 1946, covering the same years. Deficiency notices in connection with these latter assessments were sent to petitioners on November 14, 1946. These notices were identical to those of November 2, 1946, except for a difference of $.02 in that mailed petitioner Elizabeth Jane Berry. Petitions from the notices of November 14, 1946, were timely filed with this Court and docketed as numbers 13027 and 13028, respectively. Petitioners have filed motions to dismiss dockets numbered 12966, 12983, 13027 and 13028 for lack of jurisdiction. Jeopardy assessments have also been made against petitioners as to the years 1944 and 1945. The deficiency notices mailed the petitioners in connection therewith determined deficiencies and penalties for those taxable years. Petitions for redetermination thereof were timely filed with this Court and docketed as numbers 15647 and 15665, respectively. In the deficiency notice relating to Marvin Berry's taxable year 1941, the respondent made adjustments therein with resulting additions to income as follows: (a) Business income is increased by the amount of $23,972.60 computed as follows: (1) Accrued expenses disallowed
$17,334.02
(2) Depreciation disallowed
954.61
(3) Trade-in losses disallowed
859.94
(4) Business income transferred
from your wife's return
8,173.06
Total
$27,321.63
Less: (5) Crop advances accrued
3,349.03
Net increase
$23,972.60
*280 In accordance with petitioners' concessions, referred to below, it appears that $15,799.54 of the foregoing adjustments is not in dispute. No waiver of any statutory period of limitation was signed by Berry relative to the taxable year 1941 and fraud is not asserted for that year. The return was filed on March 13, 1942. No gross income is reported on the face of this return but opposite Line 3 in the space provided for "Interest on (a) bank deposits, notes, etc., * * *" it was stated "See Attached". The attachment referred to is a "Statement of Expenses & Income for Marvin Berry, and Individual d/b/a Two Boys Fruit & Produce, Bakersfield, Calif., For the Period Jan. 1 to Dec. 31, 1941". This statement reflects a total gross income for the year of $538,472.25; a cost of goods sold of $486,905.42; a gross profit on sales of $51,566.83; expenses of $35,220.70; and a net profit of $16,346.13. This last figure is then combined with Elizabeth Jane Berry's 1941 income of $780.07. The total net income of both petitioners thus computed was $17,126.20, which is allocated on their returns: One-half Marvin Berry
$8,563.10
One-half Elizabeth Jane Berry
$8,563.10 The amount of *281 $8,563.10 is then brought forward on the face of the return and placed in the space labeled "Net Income" within the section provided for "Computation of Tax". Elizabeth Jane Berry's 1941 return contains a similar statement and is, in all material respects, identical with that filed by her husband. Petitioners have conceded certain of the adjustments made by respondent in his letters of deficiencies. Certain other points and issues raised in the pleadings and at the trial have been abandoned, conceded or adjusted by stipulation of the parties. Such concessions and stipulations result in a net income for the petitioners in each of the taxable years involved. Petitioners do not concede these uncontested items are properly a part of the deficiency in so far as the issue of fraud in concerned. Petitioners have agreed to all adjustments made by respondent in Berry's 1941 income except those pertaining to the propriety of reporting such income on a community property basis. For 1942 a total net income of $26,608.91 ($14,439.74 plus $12,169.17) was reported by petitioners in their original tax returns. They now agree that this amount may be adjusted to reflect a net income of $52,299.22. *282 as follows: Additions to Net Income
Cash re-deposited
$ 12,500.00
Cash and checks to personal accounts
12,831.53
Unreported interest
345.00
Miscellaneous expense disallowed
710.74
Depreciation disallowed
2,474.61
Insurance paid
809.83
Total additions to 1942 net income
conceded
$ 29,671.71
Adjustments Reducing Net Income
Salary eliminated
$ 3,981.40
Recapitulation (1942)
Total net income reported
$ 26.608.91
Total additions to net income con-
ceded
29,671.71
$ 56,280.62
Less reduction in net income
3,981.40
Uncontested Total Net Income
$ 52,299.22
For the taxable year 1943, petitioners, in their original returns, reported a total income tax net income of $74,236.15 ($36,848.07 plus $37,388.08). They now concede that such amount may be increased to $171,234.20 by making the following adjustments: Additions to Net Income
Sales reported in 1944 returns trans-
ferred to 1943 income
$ 79,678.71
Proceeds from potatoes 5/7/43
862.00
Proceeds from potatoes 5/13/43
801.90
Cash and checks diverted to personal
use
14,120.32
Salary disallowed
$ 208.24
Unreported interest
12.50
Warehouse expense disallowed
643.75
General expense disallowed
1,153.78
Repairs disallowed
4,328.35
Depreciation disallowed
7,604.96
Partnership income increase: Edison Produce Co. $ 3,392.31
Victory Produce Co. 15,849.72
19,242.03
Total additions 1943 net income con-
ceded
$128,656.54
Adjustments Reducing Net Income
Sales reduced
$ 26,910.99
Net gain from sale of partnership
interest in Victory Produce Co.
decreased
3,945.60
Total reduction
$ 30,856.59
Recapitulation (1943)
Total income tax net income reported
$ 74,236.15
Total additions to net income
128,656.54
$202,892.69
Less total reduction in net income
30,856.59
Uncontested total net income
$172,036.10
*283 With regard to the taxable year 1944, respondent agrees and it is stipulated by the parties that a portion of the deficiency determined for that year may be eliminated by increasing the cost basis of a certain warehouse at Arvin, California, from $18,036.63 to $21,500. Petitioners agree that the total net income of $34,001.70 ($17,000.85 plus $17,000.85) as reported by them in their 1944 returns, should be increased to $70,332.76 by making the following adjustments: Additions to Net Income
Business income increased: Insurance
$ 55.50
Purchases
25,000.00
Rent
14,400.00
Labor
500.00
Miscellaneous expense (by stipu-
lation)
30,000.00
Depreciation disallowed (by stip-
ulation)
7,749.53
Total additions to net income
conceded
$ 77,705.03
Adjustments Reducing Net Income
Sales overstated
$ 41,373.97
Recapitulation (1944)
Total net income reported
$ 34,001.70
Total additions to net income con-
ceded
77,705.03
$111,706.73
Less decrease in net income
41,373.97
Uncontested total net income
$ 70,332.76
Petitioners also acquiesce in certain adjustments made by respondent which result in increasing the total net income of $29,414.62 *284 ($14,707.31 plus $14,707.31), as reported by them in their 1945 returns to $50,363.55. The adjustments to which petitioners agree, or stipulated by the parties, are as follows: Additions to Net Income
Expense disallowed (by stipulation)
$100,000.00
Miscellaneous deductions disallowed
659.61
Difference between Opie Wallis deal
net gain and Polar Ice Co. net loss
1.04
Total additions to net income
$100,660.65
Adjustments Reducing Net Income
Depreciation not deducted (by stipu-
lation)
$ 13,803.71
Expense understated
.74
Travel expense understated
1,924.95
Sales overstated
50,304.91
Net loss sustained
13,677.41
Total reduction in net income
$ 79,711.72
Recapitulation (1945)
Total net income reported
$ 29,414.62
Total additions to net income con-
ceded
100,660.65
$130,075.27
Less total reduction in net income
79,711.72
Uncontested total net income
$ 50,363.55
The petitioners in their returns for each of the taxable years involved herein, 1941 to 1945, inclusive, reported their income as community income. For the year 1941, the respondent determined that all of Berry's 1941 income was his separate income and disallowed the community *285 property division. As shown by the following unsigned financial statement submitted by Berry at a bank in Bakersfield, his net worth on January 1, 1941, was $30,524.25: Statement of ASSETS & LIABILITIES for Marvin Berry, an individual d/b/a TWO BOYS FRUIT & PRODUCE Bakersfield, Calif.Ellensburg, Wash. Seattle, Wash. Jan. 1, 1941 ASSETS
Current
Cash on hand & in bank
S. #1
$ 5,442.75
Advanced on contracts
#2
2,257.24
N.S.F. Checks Collectible
#3
173.90
Farm Growing Deals
#4
35,523.43
Utilities Deposits
#5
292.00
Prepaid Expenses
#5
117.65
Inventories (Cost)
#6
3,512.31
Accounts Receivable (Current)
#7
5,464.99
Accounts Receivable (Delinq.)
#8
1,691.41
$54,535.68
Fixed
Office Equipment
#9
1,195.66
Warehouse Equipment
#10
3,337.21
Autos & trucks
#11
3,322.21
Farm Machinery & Equipment
#12
5,147.41
Well & Pumping Equipment
#13
3,849.65
Warehouse Buildings
#14
11,730.45
Cafe Bldg. & Equipment
#15
16,710.99
45,293.58
TOTAL ASSETS
$99,829.26
LIABILITIES
Baker. - Current a/c Payable
#16
10,732.06
Baker. - Deferred a/c Payable
#16
11,427.96
Baker. - Condit. Sales Conts. 1941
4,363.46
Baker. - Condit. Sales Conts. 1942
2,411.48
Bakersfield Notes Payable
35,081.00
Accrued Expenses
2,693.96
Misc. Accounts Payable
2,595.09
69,305.01
NET WORTH
$30,524.25
TOTAL LIABILITIES & NET WORTH
$99,829.26
*286 According to his books and records Marvin Berry had a net worth of $26,232.07 on August 30, 1941, the date of his marriage. This figure does not reflect the value at that time of his growing crop of tomatoes. After adjustment was made for such value, respondent determined Berry's net worth to be $47,912.18 as of the date of his marriage. For the year 1942, respondent determined community income (before claiming increased deficiencies) as follows: (5) By reason of the foregoing adjustments to business net income, the amount of $7,213.83, computed as follows, is transferred to your wife's return as her additional share of community income: Your separate investment in your
business as of date of marriage,
August 30, 1941, has been deter-
Mined to be the amount of
$47,912.18
Fair return on investment (7% of
$47,912.18)
3,353.85
Reasonable compensation for your
services
6,000.00
Total business income for 1942, ad-
justed
60,435.22
Allocation to community income: $6,000.00 / $9,353.85 X $60,435.22
$38,766.00
Your wife's community share, cor-
rected
$19,383.00
As shown in your return
12,169.17
Amount transferred to her return
$ 7,213.83 The respondent *287 made similar determinations and allocations of community income for 1943, 1944, and 1945, adding to Berry's separate property his income for prior years as determined by the respondent. Berry had a sizeable amount of outstanding indebtedness on August 30, 1941, some of which was not shown on his books and is therefore not reflected in the above computation of net worth and allocable income. This indebtedness was retired subsequent to the critical date but prior to December 31, 1941. On this latter date Berry's net worth, as per his books and records, was $36,217.56. In 1942 Berry personally made certain payments in cash from his own funds to three creditors of the Company. Such payments amounted to $440, $250 and $110, respectively. Berry then had these payments recorded on the Company books where he was given credit therefor on his personal account. Respondent added these three payments, totaling $800, to Berry's 1942 income as proceeds from unreported sales. In 1943 Berry received the sum of $26,910.99 from the Edison Produce Company, a partnership in which he had a 45 per cent interest. This amount was later, in 1943, repaid to the partnership. In computing Berry's alleged *288 unreported income for 1943, respondent included therein, as unreported sales, all cash disbursements made by Berry from an undetermined source. Respondent then credited the foregoing $26,910.99 against the unreported sales so computed which totaled $133,213.77. The net sum thus resulting is composed of all of Berry's cash expenditures in excess of the amount so credited and the source of which could not be otherwise explained. Included in the amount so determined as unreported sales are six specific items: $7,516.35; $1,348.73; $7,122.26; $10,007.70; $5,575.00; and $1,050.00. The $7,516.35 item represents cash which was a portion of the $26,910.99 that Berry repaid to the Edison Produce Company on August 12, 1943. The balance of $19,394.64 was paid by Berry's personal check for $16,972.38 and a cashier's check for $2,422.26. On March 20, 1943, Berry used $1,348.73 in cash, together with a bank draft on the California bank in Los Angeles for $8,651.27, to purchase a $10,000 partnership interest in Victory Produce Company. Previous to this time, on March 13, 1943, Berry had withdrawn the amount of $5,000 from his account at the same bank. On June 21, 1943, Berry bought for cash *289 a cashier's check in the amount of $7,122.26 from a Bakersfield bank. On September 29, 1943, Berry bought for cash Treasury bearer bonds in the face amount of $10,000 with total accrued interest of $7.70. On November 26, 1943, Berry used $5,575 in cash, together with a check for $3,575, to purchase a cashier's check in the amount of $9,150. This check was in turn used to buy 200 shares of stock in the Bank of America. Of these shares title to 100 was taken in the name of Berry's mother and title to the remaining 100 was taken in his wife's name. Berry's wife and mother at no time held the stock, and Berry later sold it under their power of attorney. On June 7, 1943, from cash in his possession, Berry gave $1,050 to his brother. This money was used to pay workers in the fields. Examination of the books of the Company showed that the money had come from a source outside thereof. An expense account was debited on such books for this amount and a loan account credited. Later this loan account was closed out by check to Berry. On April 14, 1943, Berry deposited cash in the sum of $300 in the personal joint bank account kept in the name of himself and his wife. Again on April 23, 1943, he *290 deposited $221 in cash in the same account. In 1942 one carload of tomatoes, which Berry had raised, was shipped by him to American Fruit Growers, Inc., in the name of his mother who lived in Hollywood, California. American Fruit Growers, Inc. paid for the tomatoes by check dated December 3, 1942, in the amount of $1,635. The check was made payable to Mrs. F. E. Berry, and the proceeds were deposited to the personal account of Fanny Berry at a Hollywood bank. On November 19, 1943, Berry shipped another carload of tomatoes to American Fruit Growers, Inc., with instructions to send the proceeds to his mother, Mrs. F. E. Berry. She had not been informed prior to this shipment of any intention on the part of Berry to make such shipment a gift to her. The shipment of tomatoes was sold for the account of Fannie * Berry by American Fruit Growers, Inc. A commission of $45 was charged against the total sales price of $1,854.80. The net amount, or $1,809.80, was paid by American Fruit Growers, Inc., by check dated December 9, 1943, payable to Fannie Berry. The proceeds of this check were deposited in a Hollywood bank. In 1944, carloads of tomatoes were similarly shipped by Berry - one in *291 the name of his mother and the other in the name of his mother-in-law. The proceeds of these two shipments amounted to $3,000 and were paid to Berry's mother and mother-in-law. For the year 1942 petitioners' income was increased by the amount of $4,800, based upon the respondent's determination of estimated living costs of $400 a month. During 1942 Berry's wife maintained a checking account in the Kern County bank, on which account checks were drawn each month. Some such checks were for cash while others were in payment of certain living expenses. Respondent was unaware of the existence of such an account throughout his examination and investigation of petitioners' affairs. Checks in the total amount of $4,878.40 were drawn on the Company's bank account during 1942 and Berry's personal withdrawal account debited. The principal items for which the checks were drawn were for tax and insurance payments. Only two checks, each in the amount of $50, were for cash, such as might have been used for living expenses; one check was in payment of a tailor's *292 bill; and several checks were drawn in favor of Berry's mother. In his original income tax return for 1942, Berry reported a salary payment of $3,981.40. This amount was eliminated from Berry's income for 1942 when investigation failed to disclose any such withdrawal by Berry from the business. For 1943 respondent added $2,800 to Berry's taxable income. This amount was an estimate of living expenses for the first seven months of 1943 and was made on the same basis and upon the same theory as the amount added to 1942 income. Petitioners' living expenses during the last five months of 1942 were traced to withdrawals from the business by Berry. On January 6, 1943, petitioners had a balance of $3,674.04 in a joint bank account. From the beginning of the year to July 31, 1943, Berry's wife drew checks against this account. Some were for cash while others were for living expenses. Berry also drew from the account. During the years 1942 and 1943 petitioners lived in a substantial residence located at 250 Hermosa Drive, Bakersfield, California. The house had a 3-car garage. Berry's return for the year 1942 showed a credit for one dependent and the payment of an item of alimony. The Company *293 records show that Berry paid $801 on November 22, 1941, in purchase of 100 boxes of cranberries. Payment was made by check and this check was paid in due course by the drawee bank. The sale of the cranberries was not found recorded on Berry's books. The amount of the purchase price was added to sales. At the end of 1944 the books of the Company carried as still outstanding nine checks which were issued during that year. These checks, aggregating $785.55, were voided in a later year. They were reported as additional income in 1946. On June 4 and June 6, 1944, four checks in the total amount of $2,664 were deposited to the account of Marvin Berry Company. On the books of the Company, the bank account was debited and the sales credited with this amount. The four checks were returned by the bank with the notation "Not Sufficient Funds". The original entry on the Company books was then reversed, i.e. the bank account was credited and the sales debited with the amount of the four checks. The checks were redeposited on June 13, 1944, and the proceeds were paid to the Company. On its records the bank account was again debited with a deposit of which the controverted amount of $2,664 was *294 a part, and a sales account was credited with that amount. In September, 1944 Berry bought two houses, not including the land on which they were situated. Both houses were approximately 50 years old and their cost to Berry totaled $3,000. One of the houses had a good roof, some good flooring, and a good front porch. The other house did not have a good roof; had poor floors; and its porch was in bad condition. In addition to the original cost, Berry paid $400 for having the houses moved off the property where they were standing. One house Berry sold for $2,500 before the moving was completed; the other he had moved to one of his ranches were it was then renovated. Respondent determined that the two houses had equal value, and allocated the moving expenses, one-half to each, resulting in a cost basis of $1,700 for the house sold, which, when subtracted from the sales price of $2,500, resulted in a short-term gain of $800. Respondent added this short-term gain to Berry's income for 1944, Berry having reported no gain on the sale. Seven checks totaling $124.50 and numbered 1681 to 1687, inclusive, were issued by the Company and dated December 29, 1945. That amount was charged to farm *295 labor on the Company books. These seven checks cleared through the drawee's bank between January 2 and January 4, 1946. Another check numbered 1688, in the amount of $38.93, in payment for hauling seed potatoes, was dated December 31, 1945, and bears the rubber stamp endorsement by the collecting agent bank on the same date. The above checks numbered 1681 to 1688, inclusive, were signed for the Company by Berry's brother, Andrew Berry. A check numbered 1689, in the amount of $11,527.50, was dated December 31, 1945, and was in payment for seed potatoes. This latter check was signed by Berry and was deposited by the payee on January 22, 1946. The immediate numerical predecessors of the foregoing checks, those numbered 1676 through 1680, were dated January 4, 1946. In the deficiency notice the respondent disallowed the deduction in 1945 of the above nine checks dated December 29 and December 31, 1945, stating that the checks were "* * * issued in 1946 and antedated 12/31/45 * * *." Upon such disallowance, these same checks, aggregating $11,690.93, were claimed as deductions for the year 1946. Berry, during 1945, operated a business in the Chow Building in Bakersfield, California, where *296 he bought and sold produce. The books and records of this business were kept separately from those of his main business at Edison and the books of such business were kept on the accrual basis. Between November 25, 1945 and December 20, 1945, Berry purchased merchandise in the amount of $19,306.62. This cost was paid by checks and charged as an expense on the Company books at Edison. There was no actual sale of such merchandise by the business at Edison, it being sent to the Chow Building where it was sold. The merchandise was also entered on the Chow Building books as a purchase. No corresponding entry was made on the books of Marvin Berry Company at Edison reflecting this inter-company transaction. On July 30, 1946, Berry's bookkeeper wrote to him, in part, as follows: "* * * I am just afraid that both Edison and P St. have charged about 20,000.00 to expenses for the same thing, and if that is the case, you will be in trouble with the Internal Rev. Dept. over that. This of course is in the 1945 books. John came in and I tried to show him some of this stuff, but he rushed out again and he never does get around to doing anything about it." Berry answered this letter with a note *297 to his bookkeeper, as follows: "Leah " The diff. on Edison & P St is cranberries, apples Freight & other Produce. We only Put on Edison actual Money we borrowed. The rest you will find written off on Edison books as expenses which is OK." The entry made to the purchases account on the books of the Chow Building business was based upon two invoices. One such invoice is on the billhead stationery of Marvin Berry Company and reflects an inter-company shipment to Marvin Berry Company at 1500 P Street which was the address of the Chow Building. That invoice was in the amount of $18,161.62. The other invoice was also on an invoice form of the Marvin Berry Company, but that heading was stricken out and the name "R. E. Finn Company" typed in as the shipper. That invoice showed a shipment to Marvin Berry Company at 1500 P Street and was in the amount of $1,145. The records of the R. E. Finn Company disclosed no such sale of produce. The respondent increased sales in 1943 by adding thereto the amount of $801.90. This amount represents the estimated proceeds of a carload of potatoes that Berry shipped to Chicago Fruit and Vegetable Company on May 13, 1943. Respondent originally determined *298 the total correct income tax liability of Marvin Berry and Elizabeth Jane Berry for 1942 to be $19,070.05 and $6,503.90, respectively. Assessments have previously been made against petitioners based on the original returns filed by them as follows: Against Marvin Berry, $4,114.20; against Elizabeth Jane Berry, $3,143.27. Respondent later determined a deficiency of income tax in the amount of $19,070.05 against Marvin Berry for 1942 and $6,503.90 against Elizabeth Jane Berry for the same year. On February 17, 1945, petitioners filed amended tax returns for 1942 and 1943. In the amended returns for 1942 petitioners reported additional income from produce sales in the amount of $23,268.87, and in those for 1943 a "Revised Additional Income" which included the sum of $24,840.01. This latter sum had been received by Berry from the sale of certain lug boxes and crates amonting to $4,356.94, and from produce sales amounting to $20,483.07. These amended returns were prepared by petitioners' accountants and were based upon those accountants' examination and analyses of two previously undisclosed bank accounts after the elimination of all duplications or transfers which could be found. There *299 were deposited in one such bank account amongs totaling $70,178.79 during the years 1942 and 1943. Berry wrote checks, withdrew and expended from this bank account the total amount of such deposits between December 18, 1942 and August 26, 1943. At 2:00 p.m. on February 16, 1945, the day preceding the filing of the amended returns, Marvin Berry had access to his safe deposit box No. 316 at the Bank of America, East Bakersfield branch. On the same date Berry deposited in the Company's checking account at the same bank, amounts aggregating $48,108.88. The deposit slip showed that $24,323.07 was deposited in currency and coin; that $11,000 came from a source over which the bank had control of the money; and that $12,785.81 came from a check drawn on the Bank of America, Bakersfield main office. There was also deposited on that same date at the same bank the sum of $10,000 which was also designated on the deposit slip as coming from some source over which the bank had control of the money. The accountants who prepared the amended returns, filed on February 17, 1945, had no knowledge of the foregoing deposits before preparing such returns. They were also given no information concerning the *300 safe deposit box in connection with preparation thereof. Under date of February 17, 1945, the same date on which petitioners' amended returns were filed, there appears in the books of the Company a record of a total deposit of $48,108.88 in the Bank of America. The following explanation there appears: Cash Unreported Sales
1942
$24,840.01
1943
23,268.87
$48,108.88
The respondent, in amended answers, determined increased deficiencies and penalties from both petitioners based on additions to income, as follows: 1942
$24,804.42
1943
$27,625.81 The respondent's above addition to income in the amount of $27,625.81 is comprised of the total of $23,268.87, the amount for the year 1943 entered on the books on February 17, 1945, and the additional amount of $4,356.94 received by Berry from the sales of boxes and deposited in his bank account in 1943. The foregoing amounts of alleged unreported income were allocated by respondent to the respective petitioners in accordance with the so-called "Parker formula." The respondent, in an amendment to his amended answer in Docket No. 15647, disallowed and alleged as fraudulently claimed for "rent" of *301 certain land in the year 1944, the amount of $30,000. A lease for the land in question consisting of 400 acres of farm land in Kern County, was delivered by the owners thereof, on May 12, 1944, to the Bakersfield Abstract Company as escrow holder. The escrow instructions of the lessors were dated April 5, 1944, and provided that upon payment of $30,000 by Marvin E. Berry and Betty Jane Berry, his wife, as joint tenants, the executed lease was to be delivered to them. On May 17, 1944, Berry's agent, handling the matter, endorsed Berry's check for $30,000 over to the title company with the following written instructions: "I hand you Marvin Berry's Check No. 5774 in my favor for $30,000.00 and endorsed by me to your order, which check you are to use on instructions of said Berry and should this escrow fail the said $30,000.00 is to be delivered to said Berry." On May 18, 1944, Berry gave the escrow holder instructions which state that: "* * * you are authorized to use [the $30,000] when you can deliver to me unrecorded duplicate original of Lease dated April 5, 1944, * * *." The original of the executed lease was delivered to Berry on May 26, 1944. The lease was for a term of two *302 years commencing November 1, 1944, and the rental specified therein in the amount of $30,000 was stated to be the total rental for the two years. At the time this lease was executed, the 400 acres of land involved was under lease from the same owners to certain lessees. Such lease, dated June 12, 1940, was for a period of time extending to October 31, 1944. The consideration called for therein was rent at the rate of $2,000 per year plus the installation by the lessees of certain pipe line improvements. The lease to the Berrys contained the following option provision: "* * * The Lessors herein in consideration of the payment of the rent in this lease do hereby give and grant unto the Lessee herein the option, at any time on or before July 1, 1944, to purchase the hereinabove described property for the sum of $100,000.00, payable in cash, lawful money of the United States. "In the event this option is exercised and when the entire amount of the purchase price of $100,000.00 shall have been paid, then the Lessors herein shall execute and deliver to the Lessee herein a good and sufficient conveyance of said property. * * *
"Said purchase price of $100,000.00 includes all improvements *303 that are now located on said premises. If payment is not made or tendered on or before July 1, 1944, then this option shall be void and of no effect. It is agreed that the amount paid for this lease does not constitute any portion of the purchase price of said property and that in the event of the exercise of this option, the Lessee shall not be entitled to, or credited on account of said purchase price, any portion of the $30,000.00 paid for this lease. * * *" The lessors also delivered to the title company on May 12, 1944, a deed to the property in question dated April 5, 1944, with escrow instructions also of the latter date. The escrow instructions provided that the deed was to be delivered to petitioners on payment by them of $100,000 to the escrow holder on or before July 1, 1944. This sum was not deposited by the petitioners with the escrow holder, i.e., the title company, during 1944. The lease and the deed with the escrow instructions pertaining to each had been sent by the title company to the property owners for signature on April 5, 1944 The file of papers kept by the title company relating to the transaction contained a penciled note stating that the petitioners' agent *304 "* * * has Extension from Seller to 8/1/44." A letter from the title company to the owners of the property, dated May 1, 1945, reads, in part, as follows: "We understand from Mr. Marvin E. Berry that he will be ready to complete this escrow by July 1, 1945, in accordance with his verbal agreement with you." As of May 1, 1945, the owners of the property executed an amendment to the escrow instructions dated April 5, 1944. This amendment was delivered to the title company on May 10, 1945 The amendment reads: "Amending our escrow instructions dated April 5, 1944, wherein you were handed deed from us to Marvin Berry, time limit of your said escrow instructions is hereby extended to July 1, 1945." On June 27, 1945, Berry executed and delivered to the title company certain escrow instructions in which he advised the title company that there would be handed to it $100,000 through the Bank of America. The instructions contained the following: * * *
"Deed to us in this connection is in fulfillment of that certain option set forth in the above described lease dated April 5, 1944, which option was extended from July 1, 1944, to July 1, 1945." The $100,000 was deposited with *305 the title company by Berry and was later paid to the grantors. The deed was delivered to Berry on June 28, 1945, and on that date was recorded in the office of the County Recorder. Prior to or about the time this transaction was entered into, Berry discussed at length with his real estate agent the question of whether in connection with his getting a deed to the property, he would be able to expense $30,000 as rent and pay the other $100,000 as the balance of the purchase price. In 1946 there arose in the Superior Court of Kern County, California, a cause of action entitled Marvin E. Berry and Betty Jane Berry v. Edward A. Kelly, et al., No. 43728. The petitioners herein sought certain damages and injunctive relief for failure of the defendants who had drilled and abandoned an oil well on the property under the terms of reserved oil and gas rights to remove from the premises certain abandoned equipment. The damages sought by the plaintiffs were a fair rental value of that portion of the land, the use of which they had been deprived. The first amended complaint filed in that action was verified by Marvin Berry and alleges in Paragraph II thereof that at all times material thereto *306 (1944, 1945, 1946) the plaintiffs were the "owners" of the same property here in question. During the trial Berry testified that he purchased such property in May, 1944. The Superior Court of Kern County found that the allegations in the above-mentioned Paragraph II were true and that "* * * plaintiffs purchased the surface rights in the above-described property in April, 1944 * * *." A judgment was thereupon entered in favor of the plaintiffs based upon such allegations and findings. The building in which Berry conducted the Chow Building business, referred to above, was acquired by him in 1943 at a cost of $40,000. This edifice was a reinforced concrete structure. Berry made numerous alterations and improvements in the building, installing refrigeration facilities, basement room, new water well, 3,000 gallon tank, an Otis elevator, and a large amount of cork insulation. Berry also owned a warehouse at Bakersfield known as the Bohemian Building. In 1944 Berry had a 50 per cent partnership interest in another business at Bakersfield known as the Kern Ice Company. This was an ice and storage business and operated from a new plant constructed by Berry and his partner. Berry sold *307 his interest in this building in 1945. Berry also had, in 1945, 25 per cent interest in an ice and storage business in Santa Barbara, California, known as the Polar Ice Company. In 1943 Berry had a 50 per cent interest in the Victory Produce Company, another partnership at Los Angeles, California. He invested $17,700 in a lettuce growing venture at El Centro, California. Berry used one of the four offices in the warehouse building of the Company at Edison as his personal office. He typed some of the bookkeeping records himself and would sometimes type out checks and the related vouchers. Berry directed his bookkeeper as to the manner of allocation on the books of money of the various transactions of the business. During certain seasons of the year large amounts of cash were handled in the business. Berry maintained several checking accounts in banks in Bakersfield and Los Angeles, California. He also maintained the safe deposit box, above referred to, in a bank at East Bakersfield. Both petitioners had access to this box during the years 1943 through 1945. Berry at times kept large amounts of cash in this safe deposit box. He also had an iron safe and a filing cabinet at his office *308 at Edison, in both of which he kept considerable cash in 1943. In addition, Berry had a combination safe at his home where he kept a substantial sum of money. He sometimes carried a large amount of money on his person. During certain of the years involved herein Berry sold his produce at prices in excess of those established by the Office of Price Administration. Many such transactions were not recorded on his records or the records thereof were destroyed. In order to sell his produce above price ceilings Berry made sales directly to customers in his fields. Another method used in selling above ceiling prices was to ship, by agreement with the customers, less produce than the quantity for which those customers purportedly had paid. In 1942 Berry entered a fictitious loan on his books in the amount of $12,000. This was set up on the books as money owed his mother who had never loaned any money to the business. This device was used by Berry to put cash from otherwise unreported sales into the business. In 1944 Berry bought a Cadillac automobile, and in addition to the ceiling price, paid the amount of $1,500. This amount of $1,500 was charged to brokerage expense on Berry's books, *309 as were some purchases of whiskey. In the same year a check in the amount of $2,120.50 in payment for certain expenses incurred relative to Berry's residence was charged to warehouse expense on the books of his business. Another check in the amount of $376.50 for similar expenses in the same year was charged on the Company books to farm expense. In 1945 the payment of a personal dentist bill in the amount of $20 was charged on his books as farm expense; a $100 charge to warehouse expense was in payment of cleaning carpets in his residence; the amount of $109.08 noted on the check voucher as "repairs to body" was a personal medical expense charged on the books of his business to warehouse expense; and a check in the amount of $100 was a payment of "salary" to Berry's mother and charged to farm expense. Berry's mother never worked on his farm. In 1945, also, Berry spent approximately $38,200 on the Chow Building. Most of these expenditures constituted capital items but were deducted as current expenses on Berry's books. Many of the adjustments made by respondent, including those growing out of the facts mentioned in the foregoing paragraph, have been conceded by petitioners and appear *310 in the tabulations set out above. A part of the deficiencies in income tax of Marvin Berry for each of the years 1942, 1943, 1944 and 1945 was due to fraud with intent to evade tax. No part of the deficiency in income tax of Elizabeth Jane Berry for any of the years involved was due to fraud with intent to evade tax. In determining deficiencies against petitioners for 1942, respondent did not apply the provisions of section 6 of the Current Tax Payment Act, in so far as the tax forgiveness features of that section are concerned. He determined a deficiency and added a fraud penalty thereto for the year 1942 standing alone and without reference to the tax liability for 1943 whichever was the greater. He did not eliminate as tax for 1942 the liability computed for that year and carried one-fourth thereof into 1943. Opinion VAN FOSSAN, Judge: Our jurisdiction with respect to the proceedings in Dockets numbered 12966, 12983, 13027 and 13028 has been challenged by petitioners. We will, therefore, consider that question first. Jeopardy assessments were made against petitioners on July 18, 1946. Such assessments covered deficiencies, penalties and interest for the taxable years 1942 *311 and 1943, and in the case of petitioner Marvin Berry, a deficiency for the year 1941. It is agreed that these jeopardy assessments became invalid when respondent failed to send the respective petitioners' deficiency notices under section 272 (a), Internal Revenue Code, [2] within 60 days of their being made, as required by section 273 (b), I.R.C.[3]
*312 On September 24, 1946, and again on November 12, 1946, respondent made jeopardy assessments against the petitioners for the same years. The reason for making the assessments of November 12, 1946, is not fully explained in the record. Deficiency notices obviously relating to the assessments of September 24, 1946, were sent to petitioners on November 2, 1946. Identical deficiency notices clearly appertaining to the assessments of November 12, 1946, were mailed to petitioners on November 14, 1946. Therefore, both sets of deficiency notices were mailed within 60 days of the jeopardy assessments to which they refer. Petitioners insist that the jeopardy assessments of September 24, 1946, and November 12, 1946, are void; that the deficiency notices sent out relative thereto are without force and effect; that the petitions filed in connection therewith are a nullity; and that, therefore, our jurisdiction has not been validly invoked. Petitioners' position is based upon their contention that the provisions of section 273 (b), supra, allow the respondent to make but one jeopardy assessment for the same tax deficiencies. Petitioners' argument as to this point appears to be the same one *313 advanced by them in Berry v. Westover, 70 Fed. Supp. 537. In that case the present petitioners sought to have all of the jeopardy assessments, above referred to, declared illegal and to obtain an injunction against their enforcement. The District Court discussed the question fully and in denying petitioners the relief they sought said, inter alia: * * *
"It appears logical that if, as was decided in Page v. Lafayette Worsted Co., 1 Cir., 66 Fed. (2d) 339, the Commissioner has power to re-assess in a jeopardy assessment an amount previously refunded, he here had the power, (within the period of the statute of limitations) to make more than one jeopardy assessment covering the one liability; the fact that the assessments before us were jeopardy assessments and were followed by liens against the property of the plaintiffs was the result of the necessities of the case. * * *
"We cannot agree with plaintiffs that the failure of the Commissioner to mail a notice of deficiency after making the July assessment deprived said officer of the right to set again in motion the machinery necessary to insure collection of the taxes involved in this action. *314 "We hold that the Commissioner had the power to make the September jeopardy assessment; that the deficiency notices thereafter mailed to the plaintiffs were those commanded to be sent by Section 273(b), I.R.C., relating to jeopardy assessments, and thus the 'time during which the prohibition is in force' as prescribed by Section 272(a), I.R.C. had not commenced to run." The District Court did not find it necessary in its opinion to pass upon the validity of the assessments of November 12, 1946, inasmuch as it found valid the assessments of September 24, 1946. We concur in the above views and the reasoning employed by the Court in arriving at its conclusion. We hold that the jeopardy assessments of September 24, 1946, together with the deficiency notices thereafter sent petitioners on November 2, 1946, are valid and that we therefore have jurisdiction of the proceedings contained in Dockets numbered 12966 and 12983. Accordingly, petitioners' motions to dismiss in so far as they pertain to Dockets numbered 12966 and 12983 are denied. The jeopardy assessments of November 12, 1946, and the deficiency notices mailed in connection therewith, *315 were nullities inasmuch as the earlier jeopardy assessments and deficiency notices were valid. Consequently, Dockets numbered 13027 and 13028 are dismissed for lack of jurisdiction. The next question is whether the deficiency in the tax liability of Marvin Berry for 1941 is barred by the three-year statute of limitations pursuant to section 275(a), I.R.C.[4] The deficiency notice involved was mailed more than three years but less than five years after the return for 1941 was filed. The 1941 deficiency therefore is barred unless the five-year limitation contained in section 275 (c), I.R.C.[4] applies. When this section is invoked by the Commissioner, the burden of proof is upon him to show that the taxpayer omitted "* * * from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, * * *". See C. A. Reis, 1 T.C. 9, affirmed 142 Fed. (2d) 900. Section 275(c), supra. In our opinion, the respondent has discharged his burden. *316 The schedule attached to the tax return in question shows a total receipt of $538,472.25. This figure is reduced by a cost of goods sold in the amount of $486,905.42, leaving a gross profit of $51,566.83. Certain itemized expenses totaling $35,220.70 are then subtracted from gross profit and a net profit of $16,346.13 is arrived at. Added thereto is Elizabeth Jane Berry's 1941 income of $780.70 for a net income of $17,126.20. One-half of this amount, or $8,563.10, is allocated to each petitioner. This figure is then brought forward to the face of the income tax return of each and placed in the space labeled "Net Income" within the section provided for computation of tax. The error implicit in Berry's computation of his tax liability based upon such a division of income is patent. Since Berry was not married until August 30, 1941, an entire one-half of his gross income for the year of 1941 was not, in fact, the gross income of his wife as reported on the return. Even if we concede the propriety of Berry's reporting his 1941 income on a community property basis, an allocation must, of necessity, be made to the period before and after the date of the marriage. Thus, under any such *317 theory, only one-sixth of the $51,566.83 shown as gross income, or $8,594.47, was properly allocable to Berry's wife. The remaining five-sixths, or $42,972.36, was allocable to Berry. Berry, in substance, reported only one-half, or $25,783.42, of such income as his income. The discrepancy of $17,188.94 constitutes an "omission" from gross income within the meaning of section 275(c), supra. William L. E. O'Bryan, 1 T.C. 1137, affirmed 148 Fed. (2d) 456. This omission is obviously in excess of 25 per cent of the amount, in effect, reported by Berry as his 1941 income. Petitioners cite the holding of this Court in Leslie H. Green, 7 T.C. 263, affirmed 168 Fed. (2d) 994, and argue that it is determinative of the issue before us. In that case, however, the decision turned on the question of whether gross income should be computed without any deduction for certain capital losses. We held there that capital losses form no part of gross income and should not be considered in its computation. Consequent upon this holding there resulted no omission from gross income in excess of 25 per cent thereof. Accordingly, section 275 (c), supra, *318 could not be invoked. No such question is presented here. We are of the opinion that this case comes squarely within the rationale of William L. E. O'Bryan, supra.In that case the taxpayer, as here, filed two returns of income, one in his name and one in the name of his wife. Each return showed the total income received by the husband of $20,500; one-half of this amount, or $10,250, less one-half of the expenses, $1,029.50, or $9,220.50, was shown as the husband's income. A similar return was filed for the wife. The taxpayer-husband there argued that he reported the entire amount of his earnings qua earnings and deducted the one-half reported in the returns filed for his wife. In holding that the husband had included in his gross return only 50 per cent of his earnings and that assessment was properly made of the deficiency within the five-year period of section 275(c), the Court of Appeals stated, in part: * * *
"* * * Taxpayer argues that even though he allocated to his wife 50% of his total income and thereby understated his gross income by more than 25%, there was no omission of gross income under the statute since the full amount of his income appeared on *319 the face of the returns and since the returns indicated the allocation of income to his wife and the filing of separate returns in her name. "The mere appearance of the total amount of gross income somewhere on the face of an income tax return is not sufficient to prevent an omission within the terms of § 275(c). The government is not required to search carefully throughout a tax return to ascertain some fact which will put it on notice of error. It is apparent from the pertinent legislative history that care and good faith on the part of the taxpayer will not prevent the applicability of subsection (c). Ewald v. Commissioner of Internal Revenue, 6 Cir., 1944, 141 Fed. (2d) 750, 753. To satisfy the terms of the section, the figure which represents gross income and from which net income is derived must not be understated by an amount in excess of 25 per cent of the figure. In the instant case gross income was shown as only half the correct amount. Therefore, the limitation period for assessing deficiencies was determined by § 275(c). Ketcham v. Commissioner of Internal Revenue, 2 Cir., 1944, 142 Fed. (2d) 996, 997; *320 Reis v. Commissioner of Internal Revenue, 6 Cir., 1944, 142 Fed. (2d) 900, 903; Foster's Estate v. Commissioner of Internal Revenue, 5 Cir., 1942, 131 Fed. (2d) 405, 406." The foregoing is apposite here. There is another facet to this question which presents a further reason for sustaining respondent's position in regard to this issue. It is to be noted that the deficiency for 1941 results, in part, from respondent's disallowance of the deduction from gross income of certain business expenses in the amount of $15,799.54. His action in this respect is not now contested. Nor does such action affect the gross income as stated in the original return. However, as a result thereof Berry's 1941 income is increased by the amount of the deduction so disallowed and such increase is in excess of 25 per cent of the gross income reported. A situation somewhat similar to the one presented here arose in Corrigan v. Commissioner, 155 Fed. (2d) 164, affirming Memorandum Opinion of this Court [3 TCM 1013,]. In that case the Court of Appeals for the Sixth Circuit, in passing upon the applicability of section 275(c), said, inter alia: "The *321 taxpayer urges that the five-year limitation does not govern, upon the ground that the proposed increases in her income taxes result from the disallowance of deductions from gross income and not from omissions from gross income. The income of the taxpayer was increased by the amount of the deductions taken which was in excess of twenty-five per cent of the amount of gross income stated in the return. Since she did not report this amount in her return, she omitted it from gross income. The fact that the trustee in its return set out the entire trust income and deductions claimed does not relieve the taxpayer from her obligation to include these amounts in gross income. The omission falls squarely within the terms of § 275(c) and the five-year limitation applies. * * *" Under the authority of the above cited cases, we sustain respondent as to this issue, holding that the five-year limitation applies, and that Berry's tax deficiency for 1941 is not barred by section 275(a), supra. Several concessions by petitioners and stipulations between the parties which result in an increased net income for petitioners in each of the years under review, have been tabulated above in the findings *322 of fact or appear elsewhere in the record. No useful purpose will be served by repeating them here. Such concessions and stipulations will be properly reflected in a recomputation under Rule 50. The next issue is whether the respondent correctly determined and allocated community income of the respective petitioners. The correctness of respondent's determination of the amounts of income depends, in turn, on the outcome of several other issues. We consider first the method of allocation and the question therein involved. The method used by the respondent in allocating petitioners' community income and the basis for that method are described in George W. Van Vorst, 7 T.C. 826, 831, as follows: "In determining what part of the income derived from a business venture in California is community income and what part is separate income, the California courts have stated that it is one of the fundamental principles of the community property system that whatever is acquired through the toil or talent of either spouse belongs to the community. In re Pepper's Estate, 158 Cal. 619; *323 112 Pac. 62. Where a husband is engaged in a business in which his separate capital and his personal services are contributing to the profits, that part of the profits attributable to the capital investment is his separate income and that part attributable to his personal services is community income, the allocation to be determined from all the circumstances. Pereira v. Pereria, 156 Cal. 1; 103 Pac. 448. "In G.C.M. 9825, supra, in prescribing a rule for determining the credit allowable for earned income in cases where a husband is a member of a partnership in California, a formula was given for computing the portions of the husband's share attributable to his capital investment, on the one hand, and his services, on the other, allocating the profits in the ratio which a certain per cent return on the capital bears to an assumed reasonable salary allowance. The use of this formula was approved in Clara B. Parker, 31 B.T.A. 644, and it was applied in J. Z. Todd, 3 T.C. 643; remanded by the Circuit Court of Appeals for the Ninth Circuit, 153 Fed. (2d) 553. See J. Z. Todd, 7 T.C. 399. *324 See also Herbert L. Damner, 3 T.C. 638; and Lawrence Oliver, 4 T.C. 684." See, also, Kenneth S. Battelle, 9 T.C. 299. The above extract from the Van Vorst case describes the method used here, although the result in that case was that the use of the so-called "Parker Formula" was unnecessary because an allocation was more readily made on the basis of a partnership agreement. The petitioners do not attack the validity of respondent's method in applying the so-called "Parker Formula". But they contend that it was orally agreed between them that Berry's separate property at marriage and his future income would be community property. Petitioners cite numerous California cases to the effect that separate property of either spouse may be thus changed to community property. This alleged agreement which Berry and his wife contend they made is too convenient an arrangement to escape careful scrutiny. The contention that such an agreement was made is supported only by the self-serving testimony of the parties concerned. In the light of the whole record, we cannot give such testimony full credence. Particularly is this true in the light of the evidence *325 as to Berry's manner of conducting his other affairs in the taxable years. It is interesting to note that petitioners' argument on this point is to the effect that Berry's wife was very much a part of all of Berry's business dealings, intending to show that she was treated as having an equal interest in his earnings. However, on the question of fraud as to her, which we shall discuss later, the inconsistent position is taken that the wife knew little of what Berry was doing. The real question in dispute underlying this issue is the amount of Berry's investment in his business, or his net worth, as at the date of his marriage on August 30, 1941. Petitioners strongly contend that Berry had a large net worth deficit on that date. With this contention we cannot agree. Berry filed a financial statement with a Bakersfield bank which showed his net worth to be $30,524.25 as of January 1, 1941. It is a carefully itemized balance sheet and petitioners offered no evidence to impeach its contents. Yet, petitioners would have us believe that only eight months later Berry had a net worth deficit of approximately $28,000. There is no explanation as to how Berry could have lost almost $60,000 in *326 the eight months, during which time he was growing very profitable crops of produce. Such a fact becomes even more incredulous when we note that only four months after his marriage, or on December 31, 1941, Berry's net worth, as per his books, was $36,217.56. True, there are in evidence many letters from Berry's creditors stating, in substance, that Berry owed certain debts on August 30, 1941. But petitioners do not satisfactorily demonstrate which of the liabilities they contend were valid obligations as of the critical date were not outstanding obligations on the books from which respondent made his determination. Moreover, petitioners fail to explain why there should be the great discrepancy between the liabilities as reflected by Berry's books and those that petitioners argue really existed. It cannot be ascertained from the confused state of the record whether those debts were taken into consideration by respondent in arriving at the net worth figure used. The most that can be said is that petitioners have succeeded in raising a doubt as to the exactness of any determination. After thorough consideration of all the evidence of record, we have come to the conclusion that Berry's *327 net worth as at August 30, 1941, was, in fact, $34,299.45. This figure will be used in computations consequent hereon. In allocating the petitioners' income as between Berry's separate income, i.e., the fair return on his separate capital, and the community income taxable to each petitioner, i.e., the income accruable to Berry's personal services to the business, the respondent has employed the so-called "Parker Formula". An allocation has thus been made for each of the years 1942, 1943, 1944 and 1945. No reason exists, so far as we have been able to ascertain, why an allocation should not be made of Berry's 1941 income to the periods before and after his marriage, or why he should be taxable on more than his aliquot share of the community income after such date. Accordingly, respondent is sustained only as to the method employed in making the allocation of income to each petitioner. We hold that such an allocation based upon Berry's net worth of $34,299.45 as of August 30, 1941, will be made for the years 1942 through 1945, and that for the last four months of 1941, during which period Berry was married, he is taxable only upon his aliquot share of community income so computed. *328 The next question is whether respondent erred by including in petitioners' unreported sales for the years 1942 and 1943 certain amounts represented by cash disbursements by Berry from time to time during those years. The specific items in dispute are: The amounts of $440, $250 and $110 in 1942; and in 1943 the amounts of $7,516,35, $1,348.73, $7,122.26, $10,007.70, $5,575, $300 and $221. As for the amounts added to income in 1942, the answer is that the evidence of record does not show convincingly that the cash used by Berry came from previously accounted-for sources. Respondent's action relative thereto is therefore sustained. In determining the amount of unreported sales added to petitioners' income for 1943, respondent first totaled all cash expenditures made by Berry during that year, of the source of which there was no record. He then credited against such total the sum of $26,910.99 as representing the amount received from Edison Produce Company and later repaid to it by Berry. Berry was thus, in effect, given credit for having that much cash on hand during the period in question. The resulting figure was therefore representative of the total cash expenditures made by *329 Berry for which no source could be ascertained. While the disputed expenditures of $7,516.35 and $7,122.26 may have been paid with the identical cash making up the $26,910.99 earlier received by Berry, credit for that amount was properly given as an offset against the total amount of unexplained cash expenditures. This $26,910.99 then is no longer available to be used as a valid source of cash, and there appears in the record no other explanation of the source of the $7,516.35 and $7,122.26 cash expenditures. It would appear that there may no longer exist a valid controversy as to these and some of the other specific sums set forth above. As we have previously pointed out, the total of additional unreported sales determined by the respondent for 1943 was $133,213.77. The sum of $26,910.99 was then credited against such total. The net amount of unreported sales thus resulting was $106,302.78. Of this amount it will be noted that petitioners have heretofore conceded $95,462.93. There remains only $10,839.85 in dispute. Petitioner has the burden of proof as to this item. Absent proof to the contrary, we affirm respondent's action of including in the petitioners' income for 1943 the last *330 mentioned amount. As for a cash expenditure of $1,348.73, the evidence indicates that this amount originated from a source which was reflected elsewhere in respondent's determination. Respondent's action with regard thereto is accordingly reversed. The next question involves the shipment of tomatoes by Berry for the account of his mother and his mother-in-law. In 1942 and 1943 Berry shipped two carloads of tomatoes and caused the shipper to send the proceeds of the two shipments, in the amounts of $1,635 and $1,809.80, respectively, directly to his mother, Mrs. F. E. Berry. In 1944 two more carloads of tomatoes were similarly shipped by Berry and the total proceeds of the two shipments in the amount of $3,000 were sent to Berry's mother and mother-in-law. The petitioners contend that a sale occurred after a gift of the tomatoes; that when the "donees" sold the tomatoes they had income to the extent that the proceeds exceeded Berry's cost basis; that such income was taxable to the "donees". Petitioners rely on Estate of W. G. Farrier, 15 T.C. 277. In that case there was a gift of cattle, and the question was whether the donor realized income to the extent of the value *331 of the calves produced by the cattle while the latter were owned by the donor. In holding that the calves were not income to the donor it was said that "The donor simply made a gift of the property itself before realization of any income thereon." In the instant case, however, there was no completed gift prior to sale of the tomatoes. There is no evidence that the donees had knowledge of any such transaction. To the contrary, the evidence affirmatively shows that, in so far as the 1943 transaction was concerned, Berry's mother was not informed of any purported gift of the tomatoes to her. The medium of sale was the same as though the proceeds were to be paid to Berry, the only difference being that Berry, instead of taking payment himself, diverted the proceeds to the recipient of his bounty. Berry's efforts produced the income and as such it is taxable to him. Commissioner v. Sunnen, 333 U.S. 591. We hold that the receipts from the shipments of tomatoes, referred to above, constituted income to petitioners. The next question deals with respondent's additions to petitioners' income in the years 1942 and 1943 of the amounts of $4,800 and $2,800, respectively. These *332 amounts were based upon respondent's determination that petitioners' living costs during that period were $400 a month. Petitioners' living expenses during the last five months of 1943 were traced to payments from the business to Berry, and have otherwise been reflected in respondent's determination of gross income. Petitioners contend that the showing that certain checks were drawn on the business and charged to Berry's personal withdrawal account shows the source of living expenses. Several of those checks and those in large amounts were for tax and insurance payments, however. Petitioners have also introduced evidence showing that Berry's wife maintained a personal checking account during the year 1942; that she drew certain checks against a joint checking account with Berry during the first seven months of 1943; and that none of these activities by her were known by respondent during his investigation and his computation of the deficiency herein. There was no evidence questioning the reasonableness of such determination of petitioners' living expenses in the amount of $400 per month. The burden of proof as to this point was on the petitioners, and it cannot be said that the petitioners *333 have borne the burden of proving that the sources and amounts of their living expenses were otherwise than as determined by respondent. We hold, therefore, that the respondent did not err in adding the above amounts to petitioners' income for the years 1942 and 1943, respectively. A purchase of cranberries in the amount of $801 gives rise to the next question. Such a purchase was recorded on Berry's books but there is no record of the sale or other disposition of the produce. It appears that Berry's receipts, per books, were understated by the amount of the sales price. The inference is left in the record that if the purchase was valid, the produce was sold and never reported on Berry's books. We have concluded that the sales price of the cranberries is reflected in the respondent's other determinations of unreported and unrecorded sales. It follows that the purchase price should be allowed as a deduction. We hold, therefore, that the respondent erred in disallowing the deduction in the amount of $801. The next question involves nine checks aggregating $785.55. In 1944 those checks were entered on the books of the Marvin Berry Company, which was on a cash basis of accounting, and *334 various expense accounts were debited. The checks were later voided and the amount of the checks was reported as additional income in 1946. Petitioners suggest that the checks were sent out in 1944 and that they were held by the creditor-payees until 1946, when the checks were voided by Berry. Such a theory places too great a strain on our credulity. We affirm the respondent. The next item involves four checks in the total amount of $2,664, which were the proceeds of certain sales. The checks were deposited but returned by the bank for insufficient funds. The checks were later redeposited. We have found that proper book entries were made reversing the original entries when the checks were returned for insufficient funds, and, further, that proper book entries were made crediting sales and debiting cash when the checks were redeposited. Therefore, the respondent erred in his allegation that the controverted amount was not properly reflected in the sales account. The next question involves the gain on the sale of one of two houses which Berry bought in 1944. Berry paid a total of $3,000 for the houses and $400 for the expense of moving them. The question relates to the basis of the *335 one house which Berry sold. The evidence indicates that respondent arbitrarily redetermined the cost basis of each house to be $1,700. Petitioners have introduced persuasive evidence showing that the two houses were not of substantially the same value as determined by respondent. On the basis of such evidence, we conclude that the cost basis of the house sold was $2,500, as contended by petitioners. The respondent's determination of value and resulting gain on the sale of the house is therefore reversed. Nine checks, numbered 1681 to 1689, inclusive, drawn on the account of the Marvin Berry Company, are involved in the next issue. The respondent contends that these nine checks were actually issued in 1946 and antedated to 1945 and he has disallowed the deduction in 1945 of the items for which the checks were payment. Seven of the checks, totaling $124.50, were dated December 29, 1945, and were signed for the Marvin Berry Company by Andrew Berry, the petitioner's brother. Those checks were in payment for farm labor and cleared at the bank between January 2 and January 4, 1946. December 29, 1945, was a Saturday, and Tuesday was January 1, 1946, which was a holiday. It is not probable *336 that those checks could have cleared at the bank between January 2 and January 4, 1946, and have been antedated. We hold that respondent, as to those seven checks, was in error. Another check, numbered 1688, was dated December 31, 1945, and was endorsed by the bank on the same date. It, therefore, obviously was not antedated. The largest check, numbered 1689, was in the amount of $11,527.50. It was dated December 31, 1945, and was in payment for seed potatoes. That check was signed by petitioner Marvin Berry and was deposited by the payee on January 22, 1946. The facts that this check was signed by Berry and was in a substantial amount, set it apart from the others. It would appear that proof of the date when this check was received by the payee could have been easily shown by the payee's records and would be determinative of the question of whether the check was antedated. There was no such proof in the record. We cannot say that as to this check the petitioners have sustained their burden of proof. The next issue involves the disallowance by respondent of the amount of $19,306.62 in the taxable year 1945 for alleged overstatement of purchases. A purchase in that amount was *337 entered on both sets of Berry's books, that is, the books for the business at Edison, California, and the books for the business at the Chow Building. The merchandise was sold at the Chow Building and the sale recorded there. The purchase entry on the books at Edison was allowed to remain with no compensating entry made thereon reflecting the inter-company transaction. Petitioners apparently agree that there was a duplication of purchase entries and that one should be eliminated. They have not answered respondent's contention that at least one of the invoices, showing shipment of the merchandise, was fictitious. One of the invoices showing shipments of merchandise to the business at the Chow Building was apparently bona fide in the sense that it represented merchandise actually sent from one business to the other. Berry and his employees were so negligent in their accounting that any accurate reconstruction of events from their records, at least as to this transaction, is impossible. There is no doubt in our minds that the respondent correctly disallowed the deduction in the amount of $19,306.62. The petitioners indicated at the hearing that they did not intend to contest the respondent's *338 inclusion as unreported sales in 1943 the amount of $801.90 as the estimated proceeds of a carload of potatoes. Accordingly, such amounts have been included above in our tabulation of petitioners' concessions and will be correspondingly reflected in the recomputation under Rule 50. We next consider petitioners' contention that respondent erred in computing their deficiencies for 1942. The error made by respondent in his original determination is obvious and is purely one of mathematical computation. Petitioners, however, fail to take into consideration the Amended Answer filed by respondent wherein additional tax liability for the year 1942 is alleged. In his computation of such additional tax liability the previous error has been corrected. Since any final adjustment of this error is dependent upon our holdings herein, it will be reflected in the recomputations under Rule 50. The next issue is whether the respondent was correct in making additions to income for the years 1942 and 1943 in the amounts of $24,840.01 and $27,625.81, respectively. In 1944 Berry caused his accountants to prepare amended returns for 1942 and 1943 on the basis of certain records and two bank accounts *339 previously undisclosed by Berry. The amended returns were filed on February 17, 1945. On February 16, 1945, Berry visited his safe deposit box and on the same day and at the same bank made a deposit of $48,108.88 to the account of his business, Marvin Berry Company. The amount deposited was exactly the same as the total undisclosed sales reported in the amended returns for 1942 and 1943, but the accountants who prepared the amended returns had no knowledge of the deposit by Berry of $48,108.88. They got their information as to unreported sales from other records and bank accounts. There was no explanation in the record for Berry's action in depositing that amount of money to his business account. The explanation suggests itself that Berry thought that he was only putting into the business account money representing the undisclosed sales discovered by the accountants when, in fact, he was duplicating the disclosure by depositing funds which, until that time, had been unreported. In the course of the investigation Berry admitted on a number of occasions that during some of the years involved he had dealt in the black market activity of selling produce in excess of O.P.A. ceiling prices. *340 At the hearing Berry was unable to give any explanation regarding the source of cash in the amount of $24,323.07 which was part of the total deposit of $48,108.88. It appears that the amended returns for 1943 included the amount of $4,356.94 received by Berry in that year from sales of boxes but which amount was not previously reported, the result being that this amount was included twice in the increased deficiency claimed by the respondent in the taxable year 1943. This inclusion by respondent, who had the burden of proof on these items, of the amount of $4,356.94, in addition to the $48,108.88, as previously unreported income, was in error. We hold further that Berry did not receive unreported income in the amount of $48,108.88 in 1942 and 1943, as determined by the respondent. The amount of $48,108.88 deposited on February 16, 1945, was income to the petitioners in 1945. The next issue arises from the disallowance by respondent of a deduction in the returns for 1944 on account of "rent" in the amount of $30,000. The question is whether $30,000 paid by Berry in 1944 was rent of certain farm land or whether it was a part of the purchase price, as affirmatively alleged by respondent. *341 Section 23 (a) (1) of the Code provides for the deduction of the rental "* * * of property to which the taxpayer has not taken or is not taking title or in which he has no equity." Although certain payments may be designated as rentals, yet if, in fact, they are payments on the purchase price, such amounts so paid are not deductible from gross income. See Alexander W. Smith, Jr., Executor, 20 B.T.A. 27; Helser Machine & Marine Works, Inc., 39 B.T.A. 644; and Robert A. Taft, 27 B.T.A. 808. We have set out the details of the transaction in our Findings of Fact. Briefly, the form of the transaction was as follows: Under the terms of an ostensible lease Berry agreed to pay a total "rent" of $30,000 for a two-year period with an option to purchase for $100,000. The entire transaction was handled through an escrow holder and Berry appears also to have been represented by a real estate agent. The option to purchase was to expire on July 1, 1944. There is evidence that Berry was in close contact with the seller and that it was never intended that the option date be binding on Berry. There is also evidence that, by informal agreement, the option *342 date was extended at various times after July 1, 1944. The only formal extension of the option date was made by the seller on May 10, 1945, whereby the time limit of the option was extended to July 1, 1945, but by May 10, 1945, the original option date of July 1, 1944 had long since passed. It is apparent that the seller and Berry had reached an agreement of some sort outside the written record of the transaction. Although the lease recites that the payments thereunder would not constitute a portion of the purchase price, in the face of the whole record we are not bound thereby. The concept of a sale and purchase pervades the entire transaction. His intent in that regard and his consciousness of tax consequences are shown by the fact that, prior to or about the same time of the transaction, he consulted with his real estate agent regarding the question of whether, in connection with his getting a deed to this property, he could expend $30,000 of it as rent and pay the other $100,000 as purchase price. As to this issue the respondent is sustained. We turn now to a consideration of the fraud issue. The respondent has determined fraud penalties with respect to petitioner Marvin Berry *343 in each of the years 1942 to 1945, inclusive, and with respect to petitioner Elizabeth Jane Berry in the years 1942, 1943 and 1945. As to petitioner Elizabeth Jane Berry, we think it is clear from the record that she knew little or nothing of the real nature of Berry's business dealings. There is some evidence that she took title in certain property jointly with Berry and that she occasionally helped out in the business. But there is no evidence that she participated in any scheme to evade taxes or did more than acquiesce in her husband's preparation of her tax returns. Evidence of fraud must be clear and convincing. We hold that no part of the deficiency in any of the taxable years as to petitioner Elizabeth Jane Berry was due to fraud with intent to evade taxes. Harold B. Franklin, 34 B.T.A. 927. As to petitioner Marvin Berry, the situation is very different and presents a much more difficult problem. Berry's attitude was that the chaotic state of his records was justified by the nature of his business. The records were accurately described as chaotic. At the hearing he stated that there were hundreds of bills coming in; that he never got to see them all; that *344 he only saw some of them; and that, considering the huge number of people working for him, it was lucky that his books were in as good condition as they were. The petitioners have conceded most of the adjustments to income made by the respondent in each year. Fraud is not charged as to 1941 and is not conceded by petitioners as to any other year. After careful consideration of the voluminous and complex record in the case, we have concluded that petitioner's conduct cannot be ascribed solely to the press of business affairs, or inadvertence, nor to ignorance of his responsibility to render to the Government a full and honest account of his business dealings. The omission of large sums of income earned, the absence of reasonable excuse for such omissions, coupled with the deliberate falsification of records, and many other evidences of questionable codudct in his business dealings, all tending to reduce taxable income, create a situation which is reconcilable only with fraudulent intent. To repeat the many items which evidence a purpose to defraud would be largely a repetition of the findings of fact. We hold that in all of the years 1942 through 1945 petitioner Marvin Berry filed *345 false and fraudulent returns and that as to each year a part of the deficiency was due to fraud with intent to evade tax. This conclusion is not weakened nor is the liability for additions to the tax (fraud penalties) affected by the belated filing of amended returns. Neither does Berry's repentence, evidenced by amended returns prepared when he was so dangerously ill that he thought he was going to die, and, as he stated, "wanted to get square with Uncle Sam", absolve him from the normal consequences of his prior conduct. There remains the question of the application of the Current Tax Payment Act of 1943 * and its "tax forgiveness" provisions. We have held that a part of the deficiency for 1942, as to the petitioner Marvin Berry, was due to fraud. Therefore, as to Marvin Berry, the tax forgiveness feature does not apply for the year 1942. Not so as to petitioner Elizabeth Jane Berry. No fraud is found as to her and accordingly the statute applies. In so holding, we are not unmindful of petitioners' contention on brief involving the constitutionality of section 6 (a) of the Current Tax Payment Act of 1943 *Such issue has not been properly raised by the pleadings herein. We have *346 frequently held that we will not, and cannot, consider issues which are not raised by the pleadings. Samuel E. Hirsch, 16 T.C. 1275 [Dec. 18,338]. Therefore, we do not undertake any consideration of this question. Decisions will be entered under Rule 50 in Dockets numbered 12966, 12983, 15647 and 15665. Orders will be entered dismissing Dockets numbered 13027 and 13028 for lack of jurisdiction. Footnotes
1. As to certain of the years respondent mailed two identical notices of deficiencies.↩
*. The year "1942" was corrected to read "1943" pursuant to Tax Court order dated April 25, 1952.↩
*. The proper spelling of the given name of Berry's mother was "Fanny" although some checks were made spelling the name "Fannie."↩
2. SEC. 272. PROCEDURE IN GENERAL. (a)(1) Petition to Board of Tax Appeals. - If in the case of any taxpayer, the Commissioner determines that there is a deficiency in respect of the tax imposed by this chapter, the Commissioner is authorized to send notice of such deficiency to the taxpayer by registered mail. Within ninety days after such notice is mailed (not counting Saturday, Sunday, or a legal holiday in the District of Columbia as the ninetieth day). the taxpayer may file a petition with the Board of Tax Appeals for a redetermination of the deficiency. No assessment of a deficiency in respect of the tax imposed by this chapter and no distraint or proceeding in court for its collection shall be made, begun, or prosecuted until such notice has been mailed to the taxpayer, nor until the expiration of such ninety-day period, nor, if a petition has been filed with the Board, until the decision of the Board has become final. Notwithstanding the provisions of section 3653 (a) the making of such assessment or the beginning of such proceeding or distraint during the time such prohibition is in force may be enjoined by a proceeding in the proper court. In the case of a joint return filed by husband and wife such notice of deficiency may be a single joint notice, except that if the Commissioner has been notified by either spouse that separate residences have been established, then, in lieu of the single joint notice, duplicate originals of the joint notice must be sent by registered mail to each spouse at his last known address. If the notice is addressed to a person outside the States of the Union and the District of Columbia, the period specified in this paragraph shall be one hundred and fifty days in lieu of ninety days. * * *↩
3. SEC. 273. JEOPARDY ASSESSMENTS. * * *
(b) Deficiency Letters. - If the jeopardy assessment is made before any notice in respect of the tax to which the jeopardy assessment relates has been mailed under section 272 (a)↩, then the Commissioner shall mail a notice under such subsection within sixty days after the making of the assessment.
4. SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION. Except as provided in section 276 - (a) General Rule. - The amount of income taxes imposed by this chapter shall be assessed within three years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period. * * *
(c) Omission from Gross Income. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 5 years after the return was filed.↩
*. The year "1942" was corrected to read "1943" pursuant to Tax Court order dated April 25, 1952. - CCH.↩